All right, we call the next case up. Number 20-20525, Lady Curtis Valentine v. Bryan Collier and TDCJ. All right, Mr. Frederick, you're up first, sir. Thank you, Judge Stewart, and may it please the Court, the District Court's injunction should be First, the District Court defied the PLRA and created the very kind of special circumstances exception that the Supreme Court has consistently rejected. Second, even if the PLRA did not bar plaintiff's claims, the District Court's finding of liability is based on multiple clear errors of fact and a fundamental error of law. Now, I want to start with exhaustion, but before I do, I want to address the Court's questions about current conditions at the PAC unit. Since the data were last reported to the District Court on August 21st, this is through December 2nd, I'm informed by TDCJ that since August 21st, 17 inmates assigned to the PAC unit have tested positive. There are currently four active cases among inmates at the PAC unit. There have been 27 staff members assigned to work at the PAC unit who have tested positive since August 21st. There are nine current active cases among staff. There are currently zero inmates assigned to the PAC unit who are hospitalized with active cases of COVID-19. However, since August 21st, there have been 84 inmates assigned to the PAC unit who have stayed in a hospital for at least one night and 42 of those inmates had previously tested positive. There are no additional offender deaths. The last offender death occurred on July 27. There are currently no staff hospitalizations and there have been no staff deaths. If I could begin with exhaustion. PLRA bars the plaintiff's claims because there is no dispute that they failed to exhaust their administrative remedies before filing the suit. The District Court held that remedies were not available for two primary reasons. First, because the grievance process, quote, operated too slowly, a 7-7-3-4 in the Record on Appeal. And second, the grievance process was not effective in preventing the spread of COVID-19. That's ROA 7-7-3-5. That is a clear legal error. The District Court's reasoning precisely tracks the law as it existed before the PLRA was enacted. Under the old exhaustion regime, relief had to be speedy and effective. But Congress eliminated that requirement when it passed the PLRA. That's been explained by the Supreme Court in Ross at page 1858. Under the PLRA, the only question is whether it is possible to obtain some relief, full stop. Relief is available if there is authority to take some action in response to a complaint, even if it's not the remedy that the inmate demands. For example, in Booth v. Turner, the inmate wanted money damages. The grievance process did not provide for money damages. The court nevertheless held that the administrative process was available. There is no futility exception under the PLRA. Now, here the Record shows that TDCJ's administrative process was capable of providing some relief. Both of the plaintiffs, Mr. Valentine and Mr. King, they got some of the relief they requested in grievances. And both of the named plaintiffs testified that the administrative process was available to them. What about inmate Alvin Norris who died before he got any response to his grievance? Was his grievance effective or available? Was relief available to him? Your Honor, the fact that Mr. Norris died while his grievance was pending tells us a lot about COVID-19. It does not tell us anything about availability under the PLRA. Because the Supreme Court's been very clear in Booth v. Ross, the mere fact that one inmate is not successful in obtaining some relief, that does not mean that the administrative process is not available within the meaning of the statute. Did the proven authority change anything about the grievance process for the inmates exposed to COVID during the COVID pandemic? They did, Judge. Director Collier testified that effective May 26, the PAC unit, they basically instituted an accelerated response schedule for COVID-19 related grievances. And so, yes, they... Tell us about that response. What was the change? What was the difference in time under the new process? Oh, yes, Your Honor. So, under the revised procedure for COVID-related grievances, the first response in step one had to be returned in 15 days, and likewise, step two had to be returned in 15 days. And so, under the general exhaustion regime, the deadlines are 20 days for each step with a possible extension of 20 days for each step. But I should be clear, the fact that they made a special accommodation for COVID-19 related grievances during the pandemic as it developed, that is not evidence that the administrative process was not available at some prior point. And you only need to go back to the Supreme Court's language in Ross, Booth, and related cases, that as long as some relief is available, then the administrative process is available and inmates must exhaust. And that is a sufficient basis. Their failure to exhaust is a sufficient basis to reverse the district court. And so, the court need not proceed to the merits. I will. I'm sorry, Judge Stewart. No, no, go ahead. Sorry. If the exhaustion process was unavailable in the past, and it is available today, what is the relevance of the former variable for purposes of prospective relief, permanent injunction? Well, Judge Oldham, the relevance is that it is evaluated at the time the complaint is filed. And so, that's why when we look at Mr. Valentine and Mr. King, we need to consider the circumstances that existed then. And so, it is a, you know, unlike the Eighth Amendment inquiry, which is very much focused on the future, it is to some extent rooted in the time that the complaint was filed. And so, that's why we have focused on that. But as I said, under any circumstances in this case, the process was available as both of the inmates testified to. I'm looking at a deposition transcript from Mr. Valentine. Your requested relief for testing of all of the offenders was subsequently granted, right? Answer. It was amazingly so. And in fact, once I filed the grievance, I think it was just within days that they tested. Are you aware of authority that suggests that that makes this unavailable? The PLRA exhaustion unavailable? When the lead plaintiff is amazingly available? I'm aware of no such authority, Your Honor. And in fact, I think that that testimony and the related facts in the records lead to only one legal conclusion. And that is that remedies were available. If I may, I'd like to transition to the Eighth Amendment question. The court erred. Let me, before you leave here, let me ask one question, just for clarity. You mentioned about the revision. So exactly when and how was the revised time schedule promulgated, you know, throughout the PAC unit to the plaintiffs? I mean, was it just like a change on the website? Or was there some other broadly based dissemination that there was a change? The testimony from Director Collier indicates that it was an adjustment of the procedure within administration. And so there was a new, there was a new grievance code provided. And so the inmates were, I believe the testimonies, inmates were advised that that would be the new process. And so that, I think that's how it happened, Your Honor. They just implemented shorter deadlines. All right. So the testimony of Mr. Valentine, that's the procedure, not the revised one? Is that right? Or do I have it wrong? No, you're correct, Your Honor. Mr. Valentine and Mr. King, they were talking about the general procedure that was in place at the time they filed their complaint in late March. All right.  Thank you. Thank you, Your Honor. The district court found an Eighth Amendment violation because it deemed TDCJ's efforts inadequate. But TDCJ is not the proper focus. Collier and Herrera are. And inadequate is not the measure of liability. If we look at the record as a whole, there is no basis to hold that Collier or Herrera disregarded the risk of COVID-19, that they acted with criminal recklessness, or that they showed a wanton disregard for serious medical needs. Now, I want to start with the clear factual errors that the district court made. I'll give some examples. It found that the tests were, quote, unquote, defective because they were only approved as emergency use and not approved for testing asymptomatic individuals. That was true of every test that was available at the time of trial. Second, the court's credibility determinations are also clearly erroneous. The court found that TDCJ and the defendants were not credible because it questioned their method of testing only negative inmates who were retested. That protocol, however, was consistent with CDC guidance for testing in nursing homes. That's ROA 16076. So effectively, the court held that TDCJ and its witnesses were not credible because TDCJ followed the CDC guidance for serial testing in nursing homes. A third example. While you're on testing, let me ask you, when did the mass testing begin? Yes, Your Honor. May 12th was the first strike team testing where they tested all inmates at the PAC unit. And was the policy to test the inmates every seven days? The policy that, yes, the policy that was implemented eventually was to test inmates every seven days. And so that is the policy that continued from, I want to say, June 12th or 13th, mid-June. So the policy of every seven days was not implemented in May? That's correct, Your Honor. At first, they procured these tests and they conducted a mass test of inmates. And then eventually they began serial testing. The policy was every seven days. And so that's when it began, and it continued throughout trial. But as a matter of fact, that's not what happened, was it? After the testing on May 12th, when was the next test done? Your Honor, I believe it was June 12th. I can confirm that, but it was sometime in June. And thereafter, there was testing. There were a couple of times when they couldn't do it exactly every seven days, but it was serial testing. June 12th would have been a month after the first test. That's correct, Your Honor. So what was the explanation for not following the policies established? Well, Your Honor, I have to respectfully disagree with the premise of the question. I don't think it's a failure to follow the policy. I think it's they were creating the policy as testing became available on a mass scale. And so they eventually implemented the serial testing and continued it through trial. So they couldn't get testing every seven days? They couldn't test the prisoners every seven days? Your Honor, the record shows that they tested on May 12th. They began testing every seven days in June. And so that is the policy that they implemented. And the fact that they did that is no evidence that Collier or Herrera were deliberately indifferent. In fact, the plaintiffs have effectively conceded that there is no proof of deliberate indifference because they argue that they don't have to prove it. But as we've explained in our brief, that is contrary to Ex parte Young. It's contrary to Iqbal. There's no vicarious liability under 1983. And an Ex parte Young suit is not a suit against the state. So they're every seven day testing. Is that not Collier? That's TDCJ, Your Honor. And they did implement it. But Collier didn't have input into that decision? That's not what I'm saying, Your Honor. But there is no dispute that TDCJ implemented serial testing. Collier was aware of that. That's what they did through trial. Now, the plaintiff's effort to defend the district court's plaintiff... And it is not what they did from trial because the next testing was a month later. Your Honor, once they started in June, they did serial testing roughly every seven days. All right. Let me ask you one other thing. The test that they used had a fuse of about seven to 14 days. In other words, you didn't get the results for seven to 14 days after the test. Is that right? That was correct at one point, Your Honor. May I finish? Yeah, go ahead. That is true, Your Honor. And there is testimony in the record that the turnaround time nationally was one to two weeks as of July 23rd. That's ROA 9515. There was a massive turnaround delay nationwide 9522 and 9879. There is a turnaround time of eight days. This is a national problem. So everyone had turnaround time problems. That can't be evidence of deliberate indifference because there's no evidence that they could have achieved a shorter turnaround time on the scale necessary. So there was no turnaround time shorter than that that was available? That is the testimony of Mr. Collier. This is at 11-146-21. He said, in their experience, they simply could not get it any faster despite the fact that the curative company that performed the test apparently said on their website that they could do it in 24 hours. That's not TDCJ's experience. Well, I was about to because I have some questions on my own. So you're preempting me there. Madam Clerk, I was about to say, give Mr. Frederick an additional three minutes because I have a question. I was just sort of waiting. Shift gears just slightly. Help me understand the ADA-related claims and that set of inmates, which sort of by definition, there are a certain number of inmates who either were wheelchair-bound or whatever. So help me just understand the flavor of that a bit better. And having read all this stuff, it sort of merged all in my head, and I don't remember all the details. So how many in the PAC unit? How many were there? I mean, it kind of fit into this category of those in the wheelchairs and so forth, particular comorbidities, et cetera, et cetera. And not so much with your, I assume your argument about the PLRA would be the same. But just obviously people on crutches and wheelchairs have a different set of proclivities as far as hand washing and that kind of stuff, particularly with putting their hands back on it. So I'm not real clear exactly how that was all addressed below because it was so much other in here. But the windup of that is just shift gears slightly to that set of claims who were wheelchair bound, had extra comorbidities, et cetera, of what the policy was. And even in this revision, if there was some change about that set of plans. Yes, Judge Stewart. So the mobility impaired... Well, I took up, I guess I took up half your three minutes with my question. So sorry about that, but you don't have time to answer it. We're good. We're not in a hurry. Go ahead. Thank you, Judge Stewart. So the morbidity, the mobility impaired subclass, there was a motion to certify that subclass during trial. The subclass was not actually certified until the final injunction was entered. And so this theory kind of emerged during trial. The evidence was, or the argument is that, as you mentioned, certain inmates, they have to touch the wheels or the rings on their wheelchair wheels after they wash their hands. And so the argument is they must have hand sanitizer. But I have to confess that the ADA claim has always been a little bit amorphous. But the general theory is that they argue that TDCJ must provide a reasonable accommodation by providing individual supply of alcohol-based hand sanitizer to these mobility impaired inmates. Was that the key hang up? Because generally, you know, because it's alcohol-based, that kind of fits, you know, I guess within a general sort of ban, contraband, whatever, whatever. Penologically, I mean, was that the hang up? That's my word. You know, vis-a-vis complying. And I guess the answer is, you know, was there some alternative or no alternative? I mean, assuming arguendo, the penological issues vis-a-vis alcohol-based, but aren't there other ameliorative matters that might have addressed, you know, their special needs, you know, that didn't have alcohol in them or whatever? I'm just unclear about that piece. And you're helping me tell me that subset was never really certified. Is that it? Well, not until the actual permanent injunction, but I can answer your question about alternatives. You're correct that alcohol-based hand sanitizer is contraband. TDCJ considered it. They decided against it. But there is testimony in the record that's undisputed that wheelchair-bound inmates, they have access to gloves. This is ROA 10656. So they have an alternative. I'll also say there's no evidence in the record that anyone has contracted COVID-19 from touching a solid surface. And so the other point I'll make is the accommodation they seek would be, as far as we know from the record, unprecedented. Because there's testimony that other prisons provided a stationary source of hand sanitizer, but there's no evidence that any prison provided individual supply. And that's a key distinction because on their theory, a stationary source would not solve their problem because they would still have to wheel themselves away from it. And so we believe it is not a reasonable accommodation for that reason. Okay. All right. Thank you. Go ahead. Some mobile or some other wash stations were put in other than the sinks in the regular restaurant. Can you tell me where they were? And was it any easier for the wheelchair patients to access those stations? I can tell you where they were, Your Honor. They were in common areas outside of the dorms. And so I think based on my understanding of how the unit is set up, I don't think they would be easier necessarily to access than sinks in the dorms, which inmates could access at any time. I think it was more of a secondary measure just to provide another option. But I'll also point out that certainly through the time of trial, the whole unit was on precautionary lockdown. So inmates were not moving around really except to go take showers. And so the district court found that it was difficult for wheelchair-bound inmates to access the sinks. And you don't dispute that, I take it. Well, I would dispute that. I don't think there is any evidence that it was difficult for them to access sinks in their dorms. I think the only argument is that once they washed their hands, and there's no testimony that anybody couldn't wash their hands, it's just that then they would have to go back to their bunk. And so as I've said, they are allowed to have gloves, so that would avoid the problem of getting dirt off of the floor as you turn the wheelchair. How often could they get a new pair of gloves? There is not testimony about that, but the inmate testimony says that you can get gloves through ADS. I'm not sure what that stands for, but they're special wheelchair gloves. And so I'm not aware of any specific testimony about how often they can get them, but there's no testimony that they were unable to. All right. Let me just ask you one other area. Yeah. I understand what the plaintiff's theory was, is that the prisoner refused to accommodate the wheelchair-bound inmate's ability to achieve hand hygiene. In other words, keep clean hands, which I think is recommended by the CDC that that happened. So, you know, Georgia, USP Georgia says that a prisoner's refusal to accommodate an inmate's disability and such fundamentals as hygiene constitute a denial of prison services. So why is that not a valid theory under ADA? Well, Your Honor, it's not a valid theory for two reasons. The first is that they have not established a denial of access to a prison service. Because even if, first of all, there is no authority that the district court provided that specifically hand-washing or on-the-spot hand sanitation is a service under the ADA. But even if it is, the testimony does not show that they were denied access to that. They have an alternative, which is the use of gloves. They also get clean towels every day. And third, that would not be a reasonable accommodation to give them individual supplies of hand sanitizer because it's contraband. And so that would fundamentally change the nature of the supplies that prison provides to its inmates. And there are legitimate penological interests against that. So that's why the claim must fail. All right. Thank you, Mr. Frederick. You've still got time coming back on rebuttal. And there may be some other questions. Mr. Kevel has waited over there patiently with no books behind him. He's got a blank wall. So I guess that means he's locked and loaded without all that. But in any event, it's equal opportunity, Mr. Kevel. So I gave him an additional three. So the clerk's going to give you three over there in case you were moaning about it. You don't have to use it, but you've got it. So we'll hear from you. Thank you, Judge Stewart. May it please the court. We had a chance in April to protect the PAC unit inmates, almost all of whom are elderly and suffer from comorbidities, indifference to what COVID would do at the PAC unit. We were told that Leonard Clerkley's death was a spark that could start a blaze. But the preliminary injunction was stayed in part because the state panel found that in view of the measures TDCJ said they were taking, there was not a substantial risk of serious harm. And in part because that panel found plaintiffs had not exhausted their administrative remedies. Up until the merits hearing, TDCJ and defendants made representations about its policies and about the number of COVID deaths and illnesses and infections, about 200 infections about the time of the oral argument. In vacating the injunction, this court credited TDCJ's representation that it had substantially complied with the terms of the preliminary injunction. Judge Davis, you reluctantly concurred, but noted that the facts and representations had not been under oath and not tested by cross-examination. After an 18-day trial, the trial court determined that defendant's representations and their witnesses were not credible on a host of different issues. Do you dispute that there are four active cases in the PAC unit today? Sorry, Judge Hilden? Do you dispute that there are four active cases in the PAC unit today? Judge Hilden, what I will say is that the numbers are not credible. The district court found that on good record evidence. Defendants will- But what's the record evidence that four active cases is not credible? Well, because the website is not credible. In fact, we have texts where the defendants themselves said the website is not accurate. If you look at the record on appeal at 19-8-14, Lori Davis says, there is confusion on the website. The numbers change with no consistency. We had other texts- I think I'm asking a slightly different question. I just want to make sure I understand your position. I heard Mr. Frederick represent on behalf of his client earlier that there are four active cases at the time of trial and that today there are four active cases as we're sitting here on December 3rd. It would be an extraordinary thing, I think, to say that it's- that your friend on the other side is not giving us correct information, especially after the court asked for it in preparation of the argument. And so I want to make sure I understand. Are you saying that Mr. Frederick's assertions are not credible? I'm not saying that Mr. Frederick is intentionally trying to be inaccurate or that he is not credible. I'm saying that the website is not credible. Okay, so I guess we go back to- is it four cases? Is that- I mean, the court has to make a decision about the permanent injunction, whether we have to do exhaustion, we have to do the eighth amendment, we have to do ADA. It's all premised on a record. And so the record in front of us was four at the time of trial and four today. And so I just want to make sure that we're all on common ground for active cases. Well, not a week ago, it was six. We don't know how many it is. And I will say that if you look at the website, last month, there were 40 instances of what they called pending cause. This month, there were 51 pending cause. And so it's unclear how many there really are and what's happening at the PAC unit. So I don't think without testing this under cross-examination, we can find that these numbers are credible. I will say that Director Collier testified that the risk at the end of trial of COVID spreading again in the PAC unit was higher than it had been back in March, and that the risk was extremely high. And their expert, Dr. Dawits, agreed that the risk was extremely high. Well, if there's four active cases today, that would suggest whatever the risk was, if the risk was really high, then it would seem to suggest that those two things are true, that the ameliorative measures are extraordinary. No, I would disagree. In fact, one point on the active cases, there was a text in the record at 19-808, in which they said an offender who they had listed as recovered, because he had passed 14 days since he tested positive, went to the hospital and again tested 14 days after. And the text said, we count them only once as positive and then as recovered. So we know that CDCJ, even in view of a positive COVID test, listed this inmate as recovered on their website and not as positive. Let me get at it this way, maybe this will be helpful. Mr. Frederick, and I understand you haven't disputed this, but in the briefs filed in the court, at the time of the permanent injunctions issuance, there were four active cases. And today, there are four active cases. Do you have any record evidence, yes or no, that suggests that at either of those two points in time, there were more or less, I suppose, active cases than four? There is no record because this court only asked for the new numbers now. I can tell you that the website between those two points has shifted dramatically from zero to six to 10 back to four. So there is no record evidence of that, just like there's no record evidence it's four today, other than the representation. Can you help me understand the exhaustion argument? So Ross versus Blake squarely holds, as I read it, that there are no special circumstances exceptions to the PLRA's exhaustion obligation. Is your position that COVID is a new special circumstance? No, not at all. Sure. Sorry, Joe Dalton, did not mean to interrupt. The district court in this case did not apply a special circumstances exception. The district court faithfully followed Ross and found that for this group of prisoners in this COVID situation, with the grievance system that was in place when the suit was filed, it was a dead end, not capable of providing relief. I don't understand what that can be based on if your client, the lead plaintiff in this case, Lottie Valentine, says that the grievance procedure was quote, amazing. I don't understand how you could say it's not available. He said that he asked for testing and got it within days. Yes, and the court specifically found that that testing had been planned before the grievance was filed. There is not any record evidence at all whatsoever that any inmate received any relief based on a grievance that was filed. Both of the plaintiffs testified that they had available remedies from the grievance procedure. And I guess I'm looking really hard for a PLRA case that would say where you ask for some relief and you get some relief, but you somehow, it was unavailable to you. It certainly doesn't textually make sense, but maybe there's some circumstance or case of precedent that I can't imagine. And I'm looking for help from you. Sure. What Ross tells us, right, is that the courts have to apply the unavailability to the real world workings of the prison grievance system. And in the real world of this prison grievance system, even Mr. Valentine, who said it was amazing that he got the test the day later, didn't realize, and it came out at trial, that that test had nothing to do with his grievance. His grievance hadn't even been looked at, at the time he got the test. There is no- I understand that. I'm sorry, please. No, what I was going to say is there is no inmate who received any relief. In fact, one of the things Ross thought when he remanded the case, was one of the things the court should look at is whether they were just rubber stamping the grievances. And if you look at the grievances in this case, that's exactly what happened. That every grievance doesn't address the merits. It simply says we have a policy, we're following the policy, completely ignoring the merits of the grievance. So this grievance- What is it you're saying that Mr. Valentine is testifying to? What is he, what is your, what are you saying Mr. Valentine is testifying about? I mean, we read his words, but I mean, what are you saying that he's talking about? In context, Mr. Valentine was asked, is the grievance system available? And he said, yes, it is available, meaning I can file a grievance. And he could file a grievance. We don't dispute that. It's not available in order to provide a remedy to it. The record shows that the timing was far too long to provide relief. The system did not allow COVID grievances to be treated as emergencies, even though Mr. Valentine listed it as one. The inmates couldn't use the system and still can't to address multiple issues. They're only allowed one grievance per week. The PAC unit provided these form responses that didn't address any of the grievance issues. Mr. Reynolds' form complaining of COVID issues was returned as, quote, not grievable. So I'm looking at the district court's description of this, and I apologize if you have a different page number, but I only have the Westlaw page numbers of the district court's permanent injunction ruling. So this is on star 27. And the district court says and relies very heavily on this TDCJ acknowledgement that the 160 days for final resolution of grievances would not be adequate to address the COVID-19 pandemic. Of course, that's a purely theoretical deadline. I don't see anything in the record, and please point it to me if you do, that suggests that these things are taking 160 days. And to the contrary, you've got Mr. Valentine saying that the response time is amazing, and then he gets it in a couple of days when he asks for the testing. Well, what he was saying was it was amazing that he got tested immediately after his grievance. He wasn't saying it was amazing that they were responding quickly. We have record evidence. Maybe this is the better way of thinking about it is, can we agree that the purely theoretical maximum amount of time that TDCJ could have taken 160 days is irrelevant in light of the proposition you gave us earlier, which is that we need to think about the real world practical effects of how the grievance procedure works? In the real world, we have evidence that Mr. Butod submitted a grievance for COVID, and they passed the 80-day deadline for step one, actually didn't respond until 81 days. So we know that sometimes they do reply quicker than the 80 days for step one, and in some cases, they take the whole time or even more. Can I just, I just want to get an answer to the question. The purely theoretical maximum amount of time that TDCJ could have taken, is that relevant or irrelevant? I'm not asking about any particular inmate. I'm talking about the district court's reliance on the purely theoretical 160 days. Does that matter or not matter? It does matter. It's not the opposite, but it does matter. Yes. So apparently we do think about purely theoretical things, not just real world things. No, we do think about real world things. That's why I raised this one particular instance, where there was an inmate who took more than the allotted amount of time. I'm just trying to understand the relevance of purely theoretical. Well, I think in looking at the real world circumstances, you look at the real world that says they're allowed this much time, and they can take this much time. That's the real world. And in the real world, they could take 160 days and sometimes. All right. Let me help me help me understand where you are on appeal. You said that the district court found essentially the process was a dead end. So we're on appeal, December the whatever today is the third. So what's the position on PLRA today? Are you standing behind the district court's determination, quote, it was a dead end? Are you arguing unavailability? I mean, what within the scheme of Ross? Are you arguing to the panel today? We're at the end of the road. 12 judges have seen this case. So, you know, we're, you know, we're here. So, so what? What part of PLRA? What are you standing on the dead end? And if so, elaborate on that. So we can understand fully, you know, the measure, the argument, or are you arguing unavailability or something? I mean, just, you know, clarify it. We know what the district court said. We've all read the record and so forth. But within the time we got here, we're trying to, you know, elucidate on, on, on the appeal. So just speak to it. Yes, we are still standing on that. It is unavailable. And the dead end is what Ross listed as one possible way of showing that it's unavailable. The Rock case says an inmate is required to exhaust those, but only those grievance procedures that are capable of use to obtain some relief for the action complained of. And that if the inmate, it operates as a dead end with officers unable or consistently unwilling to provide any relief, then it's a dead end. And yes, we are standing on that because that's what all the facts in the record show. There's not one piece of evidence in the record that shows any inmate obtain any relief based on a grievance. I'm not sure I understand. What would be a, if the inmate says, I would like to have COVID testing and then the prison provides some COVID testing within an amazingly short period of time in your client's words, the fact that the prison may or may not have scheduled that before the grievance, the grievance has been met, right? It's been the thing you asked for, you received, right? If a prisoner says, I would like to receive a kosher meal and the prison delivers the kosher meal, what does it matter that the kosher meal was, was the kitchen was set up a week ahead of time? I just don't, the prisoners received the thing that the prisoner asked for. Sure. I think that might move that one particular grievance, but it wouldn't show that even that inmate received anything in response to the grievance. It certainly wouldn't be any evidence that the inmate population as a whole is capable of receiving relief based on the grievance system that was in place. So what, what would be a good case for us to look at that says the prison providing the thing requested in the grievance is actually a dead end. Not seeing the prisoner receiving that thing, certainly not Ross. What is our post Ross case that we should read? I don't know that there's a case that has that exact scenario where it just by happenstance happened that the prison had scheduled to do the thing that was grieved of, right? But there were so many other things that were grieved of and so many things that were in the injunction that weren't just the testing. And to some of the questions on testing, if I may build them, we earlier, we heard from my friend that they did testing in May. And then in mid June on June 12th, he said they started the seven day test. That's not accurate on June 23rd, not 12th. They did another mass round of testing. And it wasn't until just before fraud in the middle of July that they came up with a plan, an unwritten plan to test every seven days. And then they did not even follow it. The testimony is they refused to put it in writing. The judge found that even during trial, they weren't following the seven day testing. So the evidence on testing, while Mr. Valentine did get tested and after his grievance, it had nothing to do with the grievance. The testing system was not accurate. It is not as it has been portrayed today. And I'm sure that's just inadvertent, but they haven't done that testing. And there's no evidence even now what that testing is shown. They were ordered to produce the test results so that the underlying facts could be tested and subject to cross examination. And they never did. Can you help me understand the argument that you don't have to show subjective intention under the Eighth Amendment? That's not our argument at all. We think the evidence absolutely showed subjective intent. And what was the evidence that Brian Collier or forgetting who the second named officer was? And Brian Collier. I'm sorry, the warden of the packet, right? That the warden and the executive director didn't have or had subjective intentions. There is a vast amount of record evidence. Warden Herrera was responsible for the implementation of the policy 1452. And yet we know the record evidence shows they had the most complaints, even though they were one of 104 units. They were number one in complaints about not following the policy. We heard Warden Herrera testify that in spite of that, no one had ever been disciplined for not following the policy. He also testified he made no changes in result of any of those complaints. We know that Warden Herrera. Based on the subjective intentions, to me, they might be failures. I guess here's a perhaps a finer point on it. I'm looking at the district court's opinion right now, and I don't see anything in here about subjective intentions of the warden or the director. Is there am I missing something? It doesn't look like the district court said anything at all about subjective culpability. I think the whole factual finding and what I was starting to go through shows the subjective intent. It's all based on the factual findings, none of which are clearly erroneous, such as two dorms with capacity for 167 inmates left open for weeks, even after TDCJ allowed Warden Herrera to do that. He knew that social distancing was important. He said that, and yet he left these dorms open. There's testimony that they never did any moving people around, even though there are empty bunks to increase social distancing. So my understated argument is that if the statistics are grim and the conditions are bad objectively, that we can just infer the subjective intention by the failure to act? No, it's not that we just infer from the objective results. It's the things that I'm speaking of, the factual findings that show that they were aware of things and took no action. I think we're saying the same thing. If you're aware of objective measured stuff and you fail to address them, we can infer that you were subjectively culpable in perpetuating those conditions. I thought we were saying the same thing. Not exactly, but close. If you're aware that there's a risk, a substantial risk, and you know that, and then you recklessly disregard it, that shows the subjective intent. As one example, Warden Herrera and his staff received a grievance from Mr. Rogers, that's in the record at 17940, and he received letters from Mr. Dove and his family, a blind, half-paralyzed, wheelchair-bound inmate, about his inability to work as a janitor and how that was putting them at risk. And he and his staff took no action. The system, Warden Wilder admitted that was a safety issue, having a blind inmate work as a janitor, but they were deliberately indifferent to it. He continued as the one of two janitors for the wheelchair-bound class in that dorm for the entire time. I'll give you another example, Judge Goldman. When we had our 14th, on April 16th, when we had our preliminary injunction, Mr. Valentine testified there was normal cleaning and that the cleaning was not sufficient. Mr. King testified there was no increase in janitors or chemicals, and Dr. Young testified the cleaning was not sufficient for COVID-19. In May, they took Mr. King's deposition, and he said, we need more cleaning supplies. We never have enough cleaning supplies. In July, Mr. King testified in trial that the cleaning supplies run out by noon and that they had never been increased. Mr. Herrera said he was not aware of any increase in the cleaning chemicals before or after the suit, and there was no increase in the number of janitors. Then, right after Warden Herrera testified, Ms. Director Monroe, who was one of their will-call witnesses, was sent by Mr. Collier to the PAC unit. That's at 7686. He met all of the janitors, and unanimously they told him there are not enough cleaning chemicals. That's at 12154 in the record. And is there evidence that, like, Director Collier or the warden had the cleaning chemicals and just weren't providing them? Yes, there is record evidence that there were sufficient cleaning chemicals. Their expert testified there were more than enough cleaning chemicals. And why weren't they provided? If I may complete the loop, I may be able to tell you. So, on July 20th, after Monroe goes out and is told by all the inmate janitors that there's not enough cleaning chemicals, he's removed from their will-call witness list and he never testifies or gets subjects to cross-examine. But Director Collier is asked about what Monroe told him, and he said, Monroe told me everything looked in order. Right? That's at 14150. But then we find a text that's produced, and this is at 19814. And this says, BC, Brian Collier, met with Bobby and I to discuss a compliance assessment team or regional team to go out and look at the COVID response. He said, after talking to Gene, that's Gene Monroe, last week, he felt we were not doing everything we should have been and was wondering if that might be a factor. He said, things like cleaning supplies were raised. And he said, we need to start holding wardens more accountable. So he knew. He had, throughout this case, had been told they don't have enough cleaning supplies. He waited until trial to actually go and check it. Warden Herrera knew this all the time. Collier waited until trial to go check. And then after taking Monroe off the witness list and saying he told him everything looked fine, we see a text that he actually knew that the wardens weren't doing enough and that there wasn't enough cleaning supplies. And that, I'm sorry, my question was, is there evidence? And you were very emphatic in cutting me off that, yes, there was. And so I was waiting with bated breath to hear it, that there was evidence that the cleaning supplies were in some closet and just weren't being provided to the janitorial staff. Are you saying that there wasn't that evidence? No. No, no. I said that the expert said that there was adequate cleaning supplies, that he went there and looked. And yet there are this consistent- And Director Collier found them? Director Collier was told that the inmates were not, the janitors were not being given sufficient cleaning supplies and said, maybe this is the warden's issue. Before we, I realize your time is running short. I just want to make sure we understand your position on the ADA. What is the government service or program that was denied to the mobility-impaired subclass? It's hand hygiene that they were- Hand hygiene is a government program. So what's the authority for the idea that hand hygiene is a government program? U.S. versus Georgia, 546 U.S. 151 and 157 says that hygiene is a public service provided by the prison. So the hygiene of your hands. And then how was that denied by reason of disability? Because the wheelchair inmates were not able to get to the sinks and were repeatedly, even if they went to the sink, they testified once I leave the sink, my hands are not touching the wheels. The wheels are touching the floor and other things. And I will correct one thing that my friend said. He said there was testimony, the mobility-impaired inmates could obtain gloves. I don't believe that's accurate. I believe the testimony is gloves were only provided to inmate janitors, not to the mobility-impaired or wheelchair-bound inmates. And who testified for the mobility-impaired subclass that they couldn't reach the sink? I'll have to go back. There was testimony. I can find it. And that one of the inmates said it was very difficult for him to get to the sink based on the location of the sink. And I will correct one other thing. The testimony was that the hand-washing stations, which only appeared during trial, the hand-washing stations were not located where the inmates could get them. And Judge Olden, hand-washing stations were not located where the inmates could get access to them. And Judge Olden, I don't have the record site, but it was Mr. Pennington who testified that he had a mobility problem in being able to get to the sink. Thank you. Can I have a little extra time to ask him? Yeah, go ahead. Yeah, go ahead. I would just like for you to summarize for us the issues that the district court found Collier or Herrera were deliberately indifferent in doing or refusing to do that you rely on. Just give me a list. The things that he found that they were not doing were not tailoring a policy to the PAC unit, despite knowing that these inmates were at higher risk. They had a system-wide policy and they didn't make any accommodation, particularly to the excessive risk at the PAC unit. In brief, the prison officials say that they list some things that they did implement specifically for the PAC unit. You disagree with that? Yes, there were no specific things done for the PAC unit until we got to the edge of trial when things like hand-washing stations suddenly showed up. But things like masks were one thing. You know, we saw record evidence that the masks were provided to many other units and not to the PAC unit. And there was a specific email that said, let's not provide to all the PAC unit. Let's provide only to the 65 and older. That email was on April 13th. And then it's a day later that we have a hearing and Judge Ellison, the district court judge says, why isn't everyone giving a mask? And then on April 15th, a day later, suddenly two masks are given to everyone. So even their own policies, they weren't following them. I believe having a policy and the repeated incidents of regularly not following the policy, routinely not doing things that were said is evidence of subjective. And deliberate indifference. What else, what else? What are on your list? I would say also the fact that they knew the PAC unit had more complaints than any other unit and took no action. Collier waited until trial to set up a compliance team to go out and see what the issues were. And then even his compliance team, he said, well, I don't have a report. I can't say what they said. So he waited months and months knowing that they had the most issues and took no action. Same with Warden Herrera. That's certainly evidence of subjective intent. All right, when did they, when did the prison officials give masks to all inmates in the PAC unit? April 15th. All right, and since that time, they have changed them out every day, have they not? Where there's evidence that they don't always do that, but yes, for the most part, the record evidence was that they had masks. The big issue with the mask is that routinely the guards are not wearing masks. That was the testimony. It wasn't isolated incidents. It wasn't a negligence thing. It was a routine practice of the guards not to wear masks. How would Herrera know about that? What's that? How would Herrera necessarily know about that? Because of the grievances, the grievances, he led all of the 104 units in grievances, and a lot of that was about not wearing PPE. Warden Herrera also testified he walked the unit routinely, so he wouldn't have seen this. He said that sometimes the guards take masks off, but that just something that happens. But the testimony was that it was a routine practice. There were pictures in the record of guards not wearing masks. Okay. Our counsel said they had 27 members of the staff who had tested positive. Is that since April, or is that... I didn't understand. Is that since the trial? I understood him to say, and I can't say for sure that he's saying that since the trial. That's what I thought, too. So was there any evidence that the guards were sanctioned or written up or given a punishment for not wearing their mask properly? No. In fact, Warden Herrera testified that no one had ever been sanctioned or disciplined in any way for anything related to COVID. What about the head-to-head sleeping arrangement? I'm not clear in the head-to-head sleeping arrangement or the heads of the two inmates directly in the face of the other one, or is there a barrier between them? There is a barrier. There's the short wall that we heard about, Judge Davis, the four-foot-high wall. So when they're sleeping, their heads are separated only by that short wall. So the idea is if you slept head to foot, then you would distance the heads, you know, potentially six feet or more apart. And how far apart are they now sleeping head to head? Two feet or less. Okay. Anything else you want to tell us the district court found that the defendants here were delivering differently? I think, you know, I would just rely on the voluminous record and the factual findings of the district court that there were so many instances of them not following. I mean, I think in addition, another example of subjective intent is if you look at the grievances, that most of them are just rubber stamped with the same response. And don't actually address the grievance. So I think that shows a reckless disregard of the risk if inmates are complaining about issues related to COVID, whether under the old system or new. And in response, you just stamp, we have a policy and the policy is the policy. All right. I'm going to take the prerogative of the last question. Now, you know, we've got the record, we've read it, et cetera, et cetera. But I want to know what your best case or cases you're relying on. You know, we start from Formos versus Brennan and we got legions of cases that says delivered indifference is not the same as negligence or gross negligence. Now, the other side argues in their brief that at best, your argument is, you know, that we're imperfect. There's some holes in it. COVID is evolving. Everybody's struggling. You know, the holes in the safety net, et cetera. And, you know, it's imperfect, maybe some negligence, some gross negligence. My question to you is, don't tell me what the record says. That's not my question. Don't answer the question you think you want to answer, but answer the question I'm asking you. What is your best case or cases that even taking what you just said, amounts to delivered indifference as described in Formos versus gross negligence or something akin to that? I just want cases, not argument. I would start with the language of Formos because the language of Formos says... All right, that's all I want is the cases. I don't want the argument. I just want the cases. Okay. Now, they're already in your brief, they're in your brief, but I mean, you know, quintessentially... But so what's the closest case to this? There are plenty of prison cases, you know, but I mean, given what you said, you know, the other side says, yeah, it's imperfect. It's an evolving issue. What's the best case you have that will allow holding that what's there amounts to delivered indifference as described in Formos as opposed to a case of negligence or gross negligence? I think, Your Honor, I've relied heavily on Formos. I'd have to go back through the brief, but I think... Well, that's all right. I mean, I'm going through it. I mean, you know, the panel, this is a hot panel if you hadn't figured that out. You know, we've read the record. We've read every shred, everything, the motions panel, the panel, 12 judges, all this record, the whole schmeal. So we're here. And so, you know, we've been on Westlaw late last night. So I just want to know, I mean, it's one thing to argue, but the cases say what they say. And so I just want to know if there's some late breaking that I missed in terms of delivered indifference. But if it's what's in your brief, you've answered my question and we're going to shift back to Mr. Frederick. I think Domino versus Texas Department of Criminal Justice at 239 F-3752 is one to show that ignoring complaints and the incorrect treatment, not following the policy would be evidence of a wanton disregard of the risk from COVID. I'm told that Sheppard versus Dallas County is another recent good one as well. All right. I guess somebody's sending you notes. That's all right. It's like when you got a second chair at the trial, it's good to have that person next to you to hand you some notes when you're doing it. We've all been there, Mr. Kevel. There's nothing wrong with it. I saw you kind of in neutral waiting on some reinforcements. There's nothing wrong with that. You know, this is hard stuff. All right. I appreciate, we appreciate your candor and the argument you've given on behalf of your clients. The briefing is a tough case. That's an understatement. And so we appreciate it. All right. We're going to shift back to Mr. Frederick, who's been patiently waiting until he can do his rebuttal. All right, Mr. Frederick, you're back on. Thank you, Judge Stewart. May it please the court. I want to start by respectfully correcting Mr. Kevel's statement. There's no evidence that any inmate received relief based on a grievance. ROA 10645 is Mr. Beal. He testified that he did. The question was, so you filed a grievance and you got the relief you requested, correct? Answer. Yes, sir. The fact, stepping back, the fact that inmates undoubtedly got relief in this case before the grievance paperwork was complete, that might be evidence that the administrative process was not necessary, but it is no evidence that there was not authority to provide some relief. And that is the test of availability under the PLRA. I want to jump now to Farmer versus Brennan, which Mr. Kevel cited. The district court also cited that case. And this is, if you look at it, this shows the fundamental legal error that pervades the opinion. On ROA 7736, the district court cites Farmer for the proposition that an inference of deliberate indifference may follow, quote, from the very fact that the risk was obvious, end quote. Farmer, 511 U.S. at 842. The full quote from Farmer reads, quote, a fact finder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious, end quote. The cited passage that the district court relied on in Farmer deals with knowledge of risk. That's the objective prong of the Eighth Amendment inquiry. But the district court used that language to describe the standard for deliberate indifference. But that's the subjective prong. That's the fundamental legal error. In the opinion, gave the full requirement that the response be at least reckless. Did he not? He alluded to that requirement and he did not apply that rule. I'll give you some examples. On 7745, the court found that TDCJ was not sanitized, quote, to the minimum extent required to avoid the spread of COVID-19, end quote. That is directly contrary to Farmer versus Brennan, which holds that there is no Eighth Amendment liability merely because the harm was not averted. The court held that turnaround time showed deliberate indifference because it was, quote, simply too long to effectively contain the spread of the virus, 7744. Again, that is inferring deliberate indifference from failure to succeed in abating the risk. That's directly contrary to Farmer, to this court's decision in Sheppard versus Dallas County, and to this court's decision in Gobert, which says that in a medical conditions, in a medical treatment case, you must show that prison officials refused to treat, ignored complaints, intentionally treated incorrectly, or engaged in similar conduct through clearly events in wanton disregard for serious medical needs. I want to point the court regarding Collier and Herrera to our reply brief at six. This is where we address what the plaintiffs described as ample proof that Collier and Herrera themselves were deliberately indifferent. We have explained what you see there is they list knowledge of objective facts and then they say there was a clearly, quote, inadequate response. That's their theory of deliberate indifference. That's not what Farmer holds. That's the district court theory of deliberate indifference, and it is contrary to clear Supreme Court authority. If we look at the record as a whole, based on all of the steps that CBCJ and Collier and Herrera took to address the evolving, constantly changing pandemic, it is not possible. It is wrong as a matter of law to hold that Collier or Herrera acted with criminal recklessness or engaged in cruel and unusual punishment. Did I understand you correctly that 27 staff members have tested positive since trial? That's correct, Your Honor. Since the last report on August 21st through December 2nd, there have been a total of 27 staff members who have tested positive. Well, that just strikes me as pretty incredible. What's the answer? I mean, doesn't this show they weren't taking proper precautions? Well, no, not at all, Your Honor. The staff members, of course, are not always confined in the PAC unit. I mean, that's why. May I continue my answer, Judge Stewart? Oh, absolutely. Yeah, go ahead. Thank you. So, I mean, that's why everyone, including the district court, has recognized that prisons are uniquely susceptible to infectious disease and particularly COVID-19. The staff, they go home at night, then they come back in. And so I don't think it's a surprise. I mean, they are out in the world and unfortunately, we are seeing that people out in the world are still getting COVID-19. So I think the more important fact is, especially for deliberate indifference, what has the PAC unit continued to do? And they have continued these protective measures. What kind of test do they give the staff that guards who come in contact with the inmates? The record shows that they provide the same test to staff that they do for inmates. And when staff test positive, let me be real clear, I am not telling the court that there are 27 staff members on the PAC unit who are infected. That's when staff members are infected, they are told to quarantine. When they test positive, they're potential spreaders, aren't they? Yes, your honor, yes. And so you tested the staff members on the same schedule as the inmates? Your honor, I believe that is correct, but I could not swear to it and I can't give you a record site right now, but my understanding is that it is the same test at generally the same schedule, but I can't say that for sure. But I can tell you that, I can tell you that the fact that they've continued this testing regime and have continued to screen people and restrict offender movement that's the opposite of deliberate indifference. And if I could just take 15 seconds, Judge Stewart, thank you. I want to be very clear to affirm the district court, this court would have to do several things. You'd have to violate Congress's command that exhaustion is mandatory. You'd have to do exactly what the Supreme Court has repeatedly told lower courts not to do, create a special circumstances or as the district court said, extraordinary situation or extraordinary circumstances, exception to PLRA. You would have to contradict Farmer versus Brennan by endorsing an objective test and it would have to hold prison officials liable for a constitutional violation because they failed to completely evade the risk of harm from a once in a century pandemic. The court should stop at the first step. They cannot get over exhaustion. That's enough. We respectfully request that the court reverse. All right, thank you, Mr. Frederick. I'm sorry, Judge Davis. Exhaustion would not apply to the ADA claim. Yes, it does, Your Honor. Yes, the PLRA applies to all prisoner claims. OK. All right. Any other questions from the panel? All right, counsel, as you can tell, in effect, you know, I pushed this up to a class four. Although nobody asked, but that's why we're here. It's this is a fulsome case, if there ever was one. And the whole point of having a little argument is to have a conversation with counsel to get answers to the questions. And we appreciate both of you with the vigor and candor and preparedness and answering the questions that we have. It's a tough case, so we'll get it decided as soon and as best we can. But thank you and your respective colleagues for the good work done. So with that, you're both excused. We thank you to the court.